**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

**LEWIS BULLINGTON,**

    **Plaintiff,**

                  **Civ. No. 21-7 KK**

  **v.**

**KILOLO KIJAKAZI, Acting
Commissioner of the Social Security
Administration,**

    **Defendant.**

## MEMORANDUM OPINION AND ORDER[1]

THIS MATTER is before the Court on Plaintiff Lewis Bullington's Opposed Motion to Reverse and/or Remand, filed September 2, 2021. (Doc. 24.) The Acting Commissioner of the Social Security Administration ("Commissioner") filed a response in opposition on December 1, 2021, and Mr. Bullington filed a reply in support on December 15, 2021. (Docs. 28, 29.) Mr. Bullington filed his Notice of Briefing Complete on December 15, 2021. (Doc. 30.) Having meticulously reviewed the entire record and the relevant law, and being otherwise fully advised, the Court finds that Mr. Bullington's Motion is well-taken and should be GRANTED.

### I. BACKGROUND AND PROCEDURAL HISTORY

Mr. Bullington, age 46, brings this action under 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking reversal of the Commissioner's decision denying his claims for disability insurance benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401–434 and 1381–1383f. (Doc. 1; Doc. 24 at 1.)

---

[1] Pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have consented to the undersigned to conduct dispositive proceedings and order the entry of final judgment in this case. (Doc. 12.)

## A.  Procedural History

On March 23, 2015, Mr. Bullington filed claims for DIB and SSI alleging disability beginning November 2, 2014. (AR 108–09, 121–22.)[2] These claims were denied initially and on reconsideration. (AR 106–07, 134-35.) Mr. Bullington requested a hearing before an Administrative Law Judge ("ALJ"), which was held on December 18, 2017, and the ALJ issued an unfavorable decision on March 15, 2018, denying his claims. (AR 41, 188–89, 639–48.) Mr. Bullington appealed the decision to the Appeals Council, which denied his request for review. (AR 6.) He then appealed the decision in federal court and the case was remanded on the Commissioner's unopposed motion. (AR 661–68.)

On remand, the Appeals Council vacated the ALJ's decision and sent Mr. Bullington's case back for reconsideration.[3]  (AR 669–73.) On September 18, 2020, a different ALJ[4] held a second hearing at which Plaintiff and a vocational expert ("VE") testified. (AR 610–35.) On November 21, 2020, the ALJ issued an unfavorable decision. (AR 589–600.) The Appeals Council declined to assume jurisdiction over Mr. Bullington's case, making the ALJ's decision the Commissioner's final decision from which Mr. Bullington now appeals. *See Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004); 20 C.F.R. §§ 404.984, 416.1484.

## B.  Factual Background

Before his alleged disability onset date, Mr. Bullington worked as a machine packager, forklift operator, and material handler. (AR 451, 598.) In 2016 and 2017, he worked about 15 to 25 hours every other week for an "old friend," "helping out" on the friend's farm and installing

---

[2] Citations to "AR" refer to the Certified Transcript of the Administrative Record filed on June 4, 2021. (Doc. 19.)

[3] Mr. Bullington filed a subsequent claim for SSI on April 22, 2019. (AR 672.) The remand of his initial claim rendered the subsequent claim duplicative, and it was consolidated with his initial claim. (AR 672.)

[4] Unless otherwise specified, all discussion herein refers to the second ALJ.

fire protection sprinklers. (AR 617-19.) However, Mr. Bullington testified that "[i]t didn't work out because of [his] disability," and he has not worked since 2017. (AR 619.) Mr. Bullington currently lives alone in his deceased grandmother's house; he relies on his mother to help pay bills, drive him to stores and appointments, and assist with chores. (AR 619–20, 821.)

Mr. Bullington initially alleged disability due to PTSD, varicose veins, anxiety, and depression. (AR 108-09, 136.) In addition, he later reported disability due to head injury, chronic right hip pain, right wrist problems, and right toe problems. (AR 997-98.) At his December 2017 hearing, Mr. Bullington reported that he suffered a serious head injury in 2009 when three men assaulted him and "stomped on [his] head," fracturing the right side of his skull. (AR 701, 704.) At his September 2020 hearing, he testified that he suffers from "pain in the right side of [his] face" and "numbness in the left side," which affects his concentration. (AR 621, 624.) Mr. Bullington's toe problems stem from a 2013 motocross accident in which he fractured his right second toe, requiring fusion of the proximal inter-phalangeal joint. (AR 515.) Mr. Bullington's toe no longer bends at the fused joint, and he testified that it causes him pain, affects his ability to walk, and severely affects his ability to use stairs and ladders. (AR 623–24.)

In 2014, Mr. Bullington lacerated his right wrist after he punched a glass globe, for which he required surgery. (AR 416–17, 558, 997.) He also has been diagnosed with carpal tunnel syndrome in his left wrist. (AR 416–17, 558, 997.) Mr. Bullington claims that because of his wrist problems, he suffers from tightness and limited range of motion, which affects his ability to handle, grasp, and lift. (AR 997.) Also in 2014, Mr. Bullington suffered a right femoral hernia lifting materials at work. (AR 407.) He claims that because of this injury, he suffers chronic pain in his hip and has difficulty standing, walking, bending, squatting, and lifting. (AR 997.) Additionally,

Mr. Bullington has been diagnosed with back pain, and with severe varicose veins in his right leg requiring surgery in 2014. (AR 447, 912.)

In addition to his physical impairments, Mr. Bullington has been diagnosed with psychological impairments including anxiety disorder, post-traumatic stress disorder ("PTSD"), depression, Somatic Symptom Disorder ("SSD"),[5] unspecified trauma- and stressor-related disorder, psychotic disorder with hallucinations, alcohol use disorder in remission, and chronic post-traumatic headaches. (AR 440, 478, 551, 558, 912, 955.) He received outpatient treatment at Valle Del Sol for his psychiatric conditions off and on between May 2015 and April 2019. (AR 884–94.) Mr. Bullington also reports that he spent three months in a psychiatric day program when he was in tenth grade, but he does not recall why. (AR 468, 966.)

Mr. Bullington reports suffering sexual trauma at age seven, which causes him "feelings of shame and worthlessness," (AR 466), and he believes that his depression and anger may be traced to this incident, (AR 966). Mr. Bullington also has been diagnosed with PTSD in connection with this trauma. (AR 967.) Wendy Rodgers, L.P.C.C., noted that he "[e]xperiences recurrent, involuntary, and distressing memories of the traumatic event," "persistently tries to avoid distressing memories, thoughts, and feelings associated with the event," "has persistent negative belief that no one can be trusted and feels persistent shame," and "displays self-destructive behavior with alcohol and has problems with concentration." (AR 967.)

---

[5] "Somatic symptom disorder (SSD) occurs when a person feels extreme, exaggerated anxiety about physical symptoms. The person has such intense thoughts, feelings, and behaviors related to the symptoms, that they feel they cannot do some of the activities of daily life. They may believe routine medical problems are life threatening. This anxiety may not improve despite normal test results and reassurance from the health care provider.

A person with SSD is not faking their symptoms. The pain and other problems are real. They may be caused by a medical problem. Often, no physical cause can be found. However, it is the extreme reaction and behaviors about the symptoms that are the main problem."  https://medlineplus.gov/ency/article/000955.htm (last visited March 16, 2022).

Mr. Bullington has a history of suicidal ideation and the record documents two passive suicide attempts. (AR 68-9, 495, 545, 710-11, 967, 974.) In 2006, "he got jumped on purpose so that the assault would result in his death." (AR 967.) And in October 2014, he "punched some sort of glass globe," cutting his wrist, so he "wouldn't have to think about [his] girlfriend." (AR 416; AR 495 ("Denies [suicide attempt] but relates one instance where he has glass 'All the way through my wrist' after impulsively deciding to take down a fan")).) At his December 2017 hearing, Mr. Bullington further explained:

> I hit a piece of glass inside one of the rooms and accidentally the glass went right through my wrist there and tore all the tendons in my wrist and blood just started flying out to here, and I just sat there and looked and I said if I really want to commit suicide, just sit here and you'll eventually die.

(AR 69.)

In 2018, a Dr. Wallace prescribed medical marijuana, which Mr. Bullington uses daily to relieve his physical and psychological symptoms; Mr. Bullington testified that it "has really been helping" with his depression and anxiety.[6]  (AR 626, 857, 861, 1023.) However, he also testified that he "ha[s] anxiety pretty much 24 hours a day," his "depression symptoms are there with [him] daily," and because of these conditions he "pretty much stay[s] not being around society" and "nurs[es]" himself at home. (AR 625.)  Mr. Bullington reports abnormal/psychotic thoughts, auditory and visual hallucinations, "blackouts," and "waking dreams." (AR 69, 466, 474, 483–84, 496, 497, 545, 628, 825.) He reports hearing voices "since childhood," (AR 545), and at his September 2020 hearing testified that he has auditory and visual hallucinations "off and on in the mornings." (AR 628.) He further testified to having auditory hallucinations the day before the

---

[6] Mr. Bullington also used marijuana before receiving a prescription, and in 2018 he was diagnosed with cannabis dependency. (AR 981.)

hearing, and that when he hallucinates, it "disturbs [his] concentration completely" and takes him "five minutes to an hour" to recover. (AR 628–29.)

Mr. Bullington reported taking quetiapine in 2015 for bipolar disorder, "which he discontinued after one month due to medication side effects." (AR 336-37, 896, 1020.) In 2016, Dr. Kader AdbeleRahman prescribed amitriptyline for his "chronic posttraumatic headache" but he stopped taking the medication shortly thereafter. (AR 557-59, 715, 857.) Mr. Bullington has a history of drug use, including methamphetamine and cocaine, and a history of alcohol abuse. (AR 545.)

### C.  Medical Source Opinions

#### 1.  Dr. Charulata Nadig, Psy.D.

On August 4, 2015, Dr. Charulata Nadig conducted a consultative psychological evaluation of Mr. Bullington. (AR 483–88.) Dr. Nadig found that Mr. Bullington had a depressed mood and affect but was in the typical range of cognitive functioning. (AR 484–85.) Dr. Nadig opined that Mr. Bullington suffers from "classic delayed onset PTSD symptoms" and transient depressive symptoms associated with trauma and loss of work. (AR 486.) Dr. Nadig determined that Mr. Bullington has mild limitations in his abilities to interact with co-workers and the general public and to concentrate and persist at tasks of basic work, and a severe limitation in his ability to adapt to changes in the workplace due to hallucinations and "untriggered 'blackouts.'" (AR 486.) According to Dr. Nadig, "[t]he syncope needs to be addressed before he can work safely in any setting." (AR 486.)

#### 2.  Dr. Jennifer G. Monzones, Ph.D.

On July 13, 2016, Dr. Jennifer Monzones conducted a neurobehavioral status examination "in order to determine Mr. Bullington's current levels of neuropsychological functioning, as well

as assist in the development of diagnostic impressions and treatment recommendations." (AR 544, 547.) Dr. Monzones found that "Mr. Bullington is functioning mildly below expectation relative to longstanding average/low average abilities." (AR 550.) She explained:

> In general, Mr. Bullington demonstrates deficiencies in attention and speed of information processing that likely impacts his ability to learn new information, and to perform on many administered tests overall. He also shows mildly impaired memory, and mild executive dysfunction characterized as source memory difficulty, deficient abstract reasoning, slowed concept formation, and perseveration. He does, however, perform in the normal range on tests of simple attention, language, and visuospatial and fine and gross motor abilities.

(AR 550.)

Dr. Monzones opined that Mr. Bullington's "cognitive profile and reported complaints of cognitive difficulties are likely best explained by ongoing psychiatric factors, psychosocial distress, and recent marijuana/alcohol use," and that "[c]ognitive sequelae from remote head injury is less likely contributory[.]" (AR 550.) Diagnosing Mr. Bullington with "Other Specified Depressive Disorder, episode with insufficient symptoms," "Unspecified Trauma- and Stressor-Related Disorder," "Somatic Symptom Disorder, Moderate," and "Alcohol Use Disorder, Mild, In early remission," she concluded that "[e]motional and psychosocial distress is likely negatively contributing to Mr. Bullington's overall medical and physical functioning," and recommended therapy, a healthy lifestyle, and a reduction of alcohol and marijuana use. (AR 551.)

### 3. Dr. John Herlihy, M.D.

On December 14, 2019, Dr. John Herlihy conducted a consultative medical evaluation of Mr. Bullington. (AR 996–1003.) On exam, Dr. Herlihy found that Mr. Bullington had normal strength and range of motion and grossly normal ability to manipulate objects. (AR 1000-02.) And he noted that Mr. Bullington was able to squat and rise, get up and down from the exam table, and walk on his heels with ease, and to rise from a sitting position without assistance. (AR 1000–02.)

However, Dr. Herlihy also noted that Mr. Bullington had tenderness of the right knee, shoulder, and foot, right foot second toe deformity, moderate difficulty walking on his toes, an asymmetric smile indicating that his cranial nerves were not grossly intact, and "decreased sensation to light touch at the right side of the face." (AR 1000-02.)

Dr. Herlihy opined that Mr. Bullington has no limitations with sitting, mild limitations with standing and walking, mild limitations with lifting and carrying weight, no manipulative limitations, and the ability to frequently reach, bend, stoop, crouch, and squat. (AR 1003.)

### 4.  Dr. Joseph Aragon, M.D.

On July 16, 2020, Dr. Joseph Aragon, Mr. Bullington's treating physician of five years, completed a functional assessment report. (AR 1029–33.) Dr. Aragon noted Mr. Bullington's symptoms of "chronic pain, numbness [of the] right side of face, depression, PTSD, [and] anxiety," and opined that he is unable to complete tasks because of the "severe" pain in his face and skull. (AR 1029.) Dr. Aragon further opined that emotional factors contribute to the severity of his symptoms and functional limitations; and, his symptoms would interfere with his concentration "10 times a day." (AR 1030.) Dr. Aragon concluded that because Mr. Bullington is "unable to stay on task," he is "incapable of even 'low stress' jobs." (*Id.*)

According to Dr. Aragon, Mr. Bullington can sit for only five minutes at a time and stand for only ten; and, he can sit for no more than two hours total and stand or walk for no more than two hours total in a normal eight-hour workday. (AR 1030–31.) Additionally, Dr. Aragon opined that Mr. Bullington can never lift or carry more than ten pounds and rarely lift or carry less than ten pounds. (AR 1031.) Dr. Aragon further concluded that Mr. Bullington can rarely twist, stoop, bend, crouch, or squat, and never climb ladders or stairs. (AR 1032.) Finally, Dr. Aragon opined

that Mr. Bullington would need to take unscheduled breaks throughout the workday and his symptoms would cause him to be absent "about four days per month." (AR 1031-32.)

### D.  The ALJ's Decision

In his October 21, 2020 decision, the ALJ applied the Commissioner's five-step sequential evaluation process.[7] (AR 589-600.) At step one, the ALJ determined that Mr. Bullington has not engaged in substantial gainful activity since his alleged onset date of November 2, 2014. (AR 591.) At step two, the ALJ found that Mr. Bullington suffers from the severe impairments of "left wrist carpal tunnel syndrome; right lower extremity varicosities; right foot second toe fusion; an unspecified major depressive disorder; a trauma and stressor related disorder; a generalized anxiety disorder; and a somatic symptom disorder." (AR 591–92.) Also at step two, the ALJ determined that Mr. Bullington suffers from the non-severe impairments of "right wrist laceration, dorsalgia, alcohol use disorder in remission, and possible remote history of a traumatic brain injury" but without "objective diagnostic evidence of any medically determinable severe traumatic brain injury." (AR 592.) At step three, the ALJ found that Mr. Bullington's impairments do not meet or

---

[7] The five-step sequential evaluation process requires the ALJ to determine whether:

| | |
|---|---|
| (1) | the claimant engaged in substantial gainful activity during the alleged period of disability; |
| (2) | the claimant has a severe physical or mental impairment (or combination of impairments) that meets the duration requirement; |
| (3) | any such impairment meets or equals the severity of a listed impairment described in Appendix 1 of 20 C.F.R. Part 404, Subpart P; |
| (4) | the claimant can return to his past relevant work; and, if not, |
| (5) | the claimant is able to perform other work in the national economy, considering his residual functional capacity, age, education, and work experience. |

20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Fischer-Ross v. Barnhart*, 431 F.3d 729, 731 (10th Cir. 2005); *Grogan v. Barnhart*, 399 F.3d 1257, 1261 (10th Cir. 2005). The claimant has the burden of proof in the first four steps of the analysis and the Commissioner has the burden of proof at step five. *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007). A finding that the claimant is disabled or not disabled at any point in the process is conclusive and terminates the analysis. *Casias v. Sec'y of Health & Human Servs.*, 933 F.2d 799, 801 (10th Cir. 1991).

medically equal the severity of one of the Listings described in Appendix 1 of 20 C.F.R. Part 404,

Subpart P. (AR 593.)

At step four,[8] the ALJ found that Mr. Bullington has the residual functional capacity

("RFC")

> to perform light work … except he is able to occasionally climb ramps and stairs but never climb ladders, ropes, or scaffolds. He is able to occasionally balance, stoop, crouch, kneel, and crawl. He is able to frequently bilaterally handle and reach with the upper extremities. He is able to understand, remember, and carry out simple instructions and make commensurate work related decisions in a work setting with few workplace changes. He is able to occasionally interact with supervisors and coworkers but no interaction with the public. He is able to maintain concentration, persistence and pace for two hours at a time during the workday with normally scheduled breaks.

(AR 595.) Based on this RFC, the ALJ determined that Mr. Bullington is unable to perform his

past relevant work as a machine packager, material handler, or forklift operator. (AR 598.)

At step five, the ALJ found that, "considering [Mr. Bullington's] age, education, work

experience, and [RFC], there are jobs that exist in significant numbers in the national economy

that [he] can perform." (AR 599.) In support, the ALJ relied on vocational expert testimony that

an individual of Mr. Bullington's age and with his education, work experience, and assigned RFC

could perform jobs including production assembler, router, and power screwdriver operator. (AR

599.) The ALJ therefore concluded that Mr. Bullington "has not been under a disability, as defined

in the Social Security Act, from November 2, 2014, through the date of this decision[.]" (AR 599.)

---

[8] Step four involves three phases. *Winfrey v. Chater*, 92 F.3d 1017, 1023 (10th Cir. 1996). First, the ALJ must consider all of the relevant evidence and determine what is "the most [the claimant] can still do despite [his physical and mental] limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). This is the claimant's residual functional capacity. *Id.* Second, the ALJ must determine the physical and mental demands of the claimant's past work. *Winfrey*, 92 F.3d at 1023. Third, the ALJ must determine whether the claimant is capable of meeting those demands given his residual functional capacity. *Id.* A claimant who can perform his past relevant work is not disabled. 20 C.F.R. §§ 404.1520(f), 416.920(f).

## II.  STANDARD OF REVIEW

The Court's review of the Commissioner's final decision is limited to determining whether substantial evidence supports the ALJ's factual findings and whether the ALJ applied the correct legal standards to evaluate the evidence. 42 U.S.C. §§ 405(g); 1383(c)(3); *Hamlin*, 365 F.3d at 1214. In making these determinations, the Court must meticulously examine the entire record but may neither reweigh the evidence nor substitute its judgment for that of the agency. *Flaherty v. Astrue*, 515 F.3d 1067, 1070 (10th Cir. 2007). In other words, the Court does not reexamine the issues *de novo*. *Sisco v. U.S. Dep't of Health & Human Servs.*, 10 F.3d 739, 741 (10th Cir. 1993). The Court will not disturb the Commissioner's final decision if it correctly applies legal standards and is based on substantial evidence in the record.

"Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004) (citations and quotations omitted). It is "more than a scintilla, but less than a preponderance." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007). "A decision is not based on substantial evidence if it is overwhelmed by other evidence in the record[,]" *Langley,* 373 F.3d at 1118 (citations and quotations omitted), or "constitutes mere conclusion." *Musgrave v. Sullivan,* 966 F.2d 1371, 1374 (10th Cir. 1992). The Court's examination of the record as a whole must include "anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met."  *Grogan v. Barnhart*, 399 F.3d 1257, 1262 (10th Cir. 2005).

"The failure to apply the correct legal standard or to provide this court with a sufficient basis to determine that appropriate legal principles have been followed is grounds for reversal." *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005) (citations, quotations, and alterations omitted). Although an ALJ is not required to discuss every piece of evidence, "[t]he record must

demonstrate that the ALJ considered all of the evidence." *Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996). "[I]n addition to discussing the evidence supporting his decision, the ALJ also must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects." *Id.* at 1010. If the ALJ fails to do so, "the case must be remanded for the ALJ to set out his specific findings and his reasons for accepting or rejecting evidence[.]" *Id.*

### III.  DISCUSSION

Mr. Bullington contends that the ALJ erred in evaluating the opinions of Drs. Aragon and Nadig. (Doc. 24 at 23–24, 27.) For the reasons discussed below, these arguments are well taken, and remand is warranted.[9]

### A.  The ALJ failed to properly evaluate Dr. Aragon's opinions.

The Commissioner has issued new regulations regarding the evaluation of medical source opinions for claims filed on or after March 27, 2017. *See* "Revisions to Rules Regarding the Evaluation of Medical Evidence," 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017); *compare* 20 C.F.R. §§ 404.1527, 416.927 ("Evaluating opinion evidence for claims filed before March 27, 2017") *with* 20 C.F.R. §§ 404.1520c, 416.920c ("How we consider and articulate

---

[9] Mr. Bullington contends that the ALJ made other errors warranting reversal. (Doc. 24 at 20-27.) The Court will not address these claimed errors because they may be affected on remand. *See Wilson v. Barnhart*, 350 F.3d 1297, 1299 (10th Cir. 2003). Also, "in the hope of forestalling the repetition of avoidable error" on remand, *Chapo v. Astrue*, 682 F.3d 1285, 1292 (10th Cir. 2012), the Court notes that it has concerns regarding the ALJ's treatment of Mr. Bullington's medical marijuana use. The ALJ observed that medical marijuana has "greatly helped" Mr. Bullington's "physical and mental symptoms." (AR 595-96.) However, in assessing Mr. Bullington's RFC, he failed to discuss record evidence of side effects from Mr. Bullington's medical marijuana use and gave significant weight to the report of Dr. Monzones, (AR 597), who recommended that Mr. Bullington reduce his use "in order to maximize his cognitive abilities." (AR 550-51.) That the ALJ relied on medical marijuana's benefits but disregarded its side effects is troubling. *See Maryanne M. v. Saul*, No. 19-2008, 2021 WL 1186830, at *11 (S.D. Cal. Mar. 30, 2021) (ALJ must provide an explanation when RCF contains "no mental limitations to account for the potential side effects of using marijuana"); *accord Hamby v. Astrue*, 260 F. App'x 108, 113 (10th Cir. 2008) (it is reversible error for ALJ to fail to consider medication side effects in RFC analysis).

medical opinions and prior administrative medical findings for claims filed on or after March 27, 2017"). However, because Mr. Bullington filed his claims in March 2015, the previous regulations apply. 20 C.F.R. §§ 404.1527, 416.927.

The applicable regulations incorporate the "treating physician rule." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). Pursuant to this rule, "the ALJ must complete a sequential two-step inquiry." *Krauser v. Astrue*, 638 F.3d 1324, 1330 (10th Cir. 2011). First, the ALJ must consider "whether the opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques.'" *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003) (quoting SSR 96–2p, 1996 WL 374188, at *2)). "If the ALJ finds that the opinion is well-supported," he must then determine whether "the opinion is consistent with other substantial evidence in the record." *Id.* If the opinion is both well-supported and consistent, he must give the opinion controlling weight. *Id.* Conversely, if the ALJ finds that the opinion is inconsistent with other substantial evidence in the record, he must explain or identify the inconsistencies with sufficient specificity to allow for meaningful review. *Langley*, 373 F.3d at 1123.

Second, "even if a treating physician's opinion is not entitled to controlling weight, treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. §§ 404.1527 and 416.927." *Robinson v. Barnhart*, 366 F.3d 1078, 1082 (10th Cir. 2004) (quoting *Watkins*, 350 F.3d at 1301) (quotation marks and brackets omitted). These factors are:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

*Id.*

The ALJ is not required to discuss each factor. *See Oldham v. Astrue*, 509 F.3d 1254, 1258

(10th Cir. 2007). However, he

> must give good reasons for the weight assigned to a treating physician's opinion,
> that are sufficiently specific to make clear to any subsequent reviewers the weight
> the adjudicator gave to the treating source's medical opinions and the reason for
> that weight. If the ALJ rejects the opinion completely, he must then give specific,
> legitimate reasons for doing so.

*Robinson*, 366 F.3d at 1082 (ellipses, quotation marks, citation, and brackets omitted).  Moreover,

in rejecting a treating source opinion, "an ALJ may not make speculative inferences from medical

reports and may reject a treating physician's opinion outright only on the basis of contradictory

medical evidence and not due to his or her own credibility judgments, speculation or lay opinion."

*Id.*

Here, the ALJ's analysis of Dr. Aragon's opinion is as follows:

> In July 2020, a treating primary care physician, Dr. Joseph Aragon, completed a
> functional assessment report ([AR 1029–33]). He opined the claimant's severe pain
> would frequently interfere with attention and concentration but the claimant was
> not taking any medication. He opined the claimant was unable to stay on task. He
> opined the claimant was limited to lifting less than 10 pounds, sitting less than two
> hours total of an eight-hour day, and standing/walking less than two hours. He
> further opined the claimant would need to be absent about four days per month.

> I give these opinions very little weight because they are inconsistent with the
> objective medical evidence, generally normal physical and neurological
> examinations throughout the record, the detailed consultative medical evaluation,
> and the claimant's activities. The opinions are also inconsistent with Dr. Aragon's
> own treatment record indicating generally normal physical, neurological, and
> psychiatric examinations (see [AR 436–41, 907–20, 1019–28]).

(AR 597.)

There are two problems with this analysis.  First, it omits any discussion of objective

medical evidence supporting a key opinion of Dr. Aragon. *Inter alia*, Dr. Aragon opined that Mr.

Bullington suffers from severe facial pain, which renders him "unable to complete tasks." (AR

14

1029.) In support, Dr. Aragon noted imaging showing "fractures in [Mr. Bullington's] skull and facial bones." (AR 1029.) However, the ALJ did not discuss this imaging or whether it constituted a "medically acceptable clinical [or] laboratory diagnostic technique[]" that supported Dr. Aragon's opinion. *Watkins*, 350 F.3d at 1300. The ALJ also failed to discuss other objective medical evidence consistent with the opinion, *i.e.,* Dr. Herlihy's finding of nerve damage in Mr. Bullington's face. (AR 1000-02.) In short, although "the ALJ obviously did not give Dr. [Aragon's] opinion controlling weight," he did not sufficiently articulate his reasons for declining to do so. *Watkins*, 350 F.3d at 1300; *see Clifton*, 79 F.3d at 1010 (ALJ must discuss "uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects"). Thus, the Court cannot properly review the ALJ's rejection of the opinion.

Turning to the second flaw in the ALJ's analysis, the ALJ found Dr. Aragon's collective opinions to be inconsistent with "the objective medical evidence," "generally normal physical and neurological examinations throughout the record," and Mr. Bullington's "activities." (AR 597.) However, he did not identify the claimed inconsistencies with any specificity or provide any meaningful citations to the record.[10] (AR 597); *Langley*, 373 F.3d at 1123. His analysis includes only two citations, one to Dr. Aragon's report in its entirety and the other to the entirety of Dr. Aragon's treatment records. (AR 597.) As such, again, he did not adequately discuss why none of Dr. Aragon's opinions are entitled to controlling weight. *Watkins*, 350 F.3d at 1300. In addition,

---

[10] Furthermore, although the ALJ did discuss Mr. Bullington's "generally normal physical and neurological examinations" and "activities" elsewhere in his decision, his discussion does not adequately address whether or to what extent these examinations and activities are inconsistent with any of Dr. Aragon's opinions. (AR 592, 594, 596-97.) For example, the ALJ did not discuss the abnormalities Dr. Herlihy found on physical and neurological examination, (AR 592, 597; *see* AR 1000-02); and, although the ALJ stated that Mr. Bullington was "able to … perform part-time work installing fire protection equipment," (AR 594, 596), he did not discuss Mr. Bullington's testimony that this job "didn't work out because of [his] disability." (AR 596; *see* AR 619.)

he failed to provide "specific, legitimate reasons" for rejecting these opinions and the Court cannot meaningfully review the rejection. *Robinson*, 366 F.3d at 1082.

The ALJ does refer to "the detailed consultative medical evaluation" of Mr. Bullington, presumably by Dr. Herlihy, to support his rejection of Dr. Aragon's opinions. (AR 597.) However, without more, this broad reference is insufficient to constitute a specific, legitimate reason for rejecting the opinions *en masse*. The ALJ provides no meaningful explanation or discussion of any inconsistences between Dr. Herlihy's evaluation and any of Dr. Aragon's opinions.

The ALJ does note elsewhere in his decision that Dr. Herlihy's evaluation was "generally within normal limits with normal gait, normal strength in all extremities, normal sensation and normal hand eye coordination." (AR 592, 597.) On its face, this could be at odds with some of Dr. Aragon's opinions about Mr. Bullington's physical limitations. But Dr. Aragon considered Mr. Bullington's physical and psychological impairments in combination, whereas Dr. Herlihy only evaluated Mr. Bullington's physical abilities. (*Compare* AR 997-1003 *with* AR 1029-33.) Also, the ALJ failed to discuss Dr. Herlihy's observations that Mr. Bullington displayed abnormal facial sensation, tenderness of the right knee, shoulder and foot, right foot second toe deformity, and moderate difficulty walking on his toes. (AR 1001; *see* AR 592, 597.) As such, it is not clear that there is an inconsistency, and the ALJ's failure to provide an explanation or discussion on this point prevents the Court from meaningfully reviewing the weight the ALJ assigned to Dr. Aragon's opinions.

In sum, the ALJ failed to adequately discuss whether Dr. Aragon's opinions were well-supported and consistent and therefore entitled to controlling weight. *Watkins*, 350 F.3d at 1300. Additionally, though the ALJ obviously found that these opinions were not entitled to controlling weight, he failed to provide specific, legitimate reasons for rejecting all of them completely.

*Robinson*, 366 F.3d at 1082. Because the ALJ failed to adequately explain his rejection of Dr. Aragon's opinions, the Court is left "to speculate what specific evidence led the ALJ to [his] conclusion." *Guice v. Comm'r, SSA*, 785 F. App'x 565, 572 (10th Cir. 2019) (quoting *Langley*, 373 F.3d at 1123) (quotation marks omitted). The Court cannot meaningfully review the ALJ's determination and remand is warranted.

**B.   The ALJ failed to properly evaluate Dr. Nadig's opinion.**

In her report, Dr. Nadig concluded that Mr. Bullington has a severe limitation in adapting to changes in the workplace due to hallucinations and blackouts. (AR 486.) The ALJ gave Dr. Nadig's opinion "limited weight" on the bases that "Dr. Nadig's mental status examination and other mental status and psychiatric examinations throughout the record since 2015 have been generally normal" and there is no "objective" or "credible" evidence of "recurrent psychotic symptoms" and no "objective" or "medical" evidence of "recurrent blackouts or syncope." (AR 594, 596.) However, in his analysis, the ALJ failed to discuss significantly probative conflicting evidence and improperly evaluated the evidence of Mr. Bullington's hallucinations and blackouts.[11]

> *1.   The ALJ failed to discuss or explain conflicting evidence in rejecting Dr. Nadig's opinion on the basis of normal mental status exams.*

"The ALJ is charged with carefully considering *all* the relevant evidence and linking his findings to specific evidence." *Barnett v. Apfel*, 321 F.3d 687, 689 (10th Cir. 2000) (emphasis

---

[11] Furthermore, it is problematic that the ALJ gave significant weight to the opinions of state agency consultants while rejecting the opinion of Dr. Nadig, an in-person consultative examiner, on the sole basis that the former opinions "have indicated the claimant had the necessary mental and physical residual functional capacity to perform unskilled light work with limited social interactions," (AR 596); *see Robinson*, 366 F.3d at 1084 ("The opinion of an examining physician is generally entitled to less weight than that of a treating physician, and the opinion of an agency physician who has never seen the claimant is entitled to the least weight of all.") (citing 20 C.F.R. § 416.927(1), (2) and SSR 96–6p, 1996 WL 374180, at *2).

added). The ALJ rejected Dr. Nadig's opinion on the basis that Mr. Bullington's "mental status and psychiatric examinations throughout the record since 2015 have been generally normal." (AR 596.) But it is not clear that substantial record evidence supports this finding. There are three mental status exams in the record that include no abnormal findings. Specifically, Dr. Aragon's mental status exams on April 10, 2015, July 23, 2018, and January 29, 2020, found Mr. Bullington to be "oriented to person, place and time" with a "normal mood and affect."[12] (AR 439, 912, 1022.)

However, the record contains five other mental status exams that include multiple abnormal findings:

- On May 1, 2015, a Valle Del Sol provider performed a mental status exam as part of a clinical psychological assessment, finding: "**Attitude Towards Examiner**: accessible and aggressive…. **Speech**: rapid speech, rambling and loud…. **Mood Objective**: angry, hostile and excited…. **Thought Content**: visual hallucinations, auditory hallucinations, paranoia, delusional, grandiosity and hypnopompic hallucinations…. **Judgement**: limited. **Insight**: limited." (AR 871 (emphases in original).)

- On August 4, 2015, Dr. Nadig performed a mental status exam as part of a consultative psychological evaluation, finding that Mr. Bullington had a depressed mood and depressed affect. (AR 484.)

---

[12] The ALJ cites Mr. Bullington's 2019 treatment records from Valle Del Sol as examples of normal status exams and the Commissioner claims that these records "show that … Plaintiff attended outpatient therapy on two occasions in 2019" and "[n]o abnormal mental findings were recorded at these visits[.]" (AR 596; Doc. 28 at 7 (citing AR 1008–16).) The records the ALJ and the Commissioner cited here are a "Discharge Summary" and a "Treatment Plan." (AR 1008–1018.) Nothing in the records for Mr. Bullington's April 8, 2019 "Discharge Summary" or June 27, 2019 "Treatment Plan" indicate that Mr. Bullington was examined during either visit, or that any findings were made on those dates. Thus, the Court finds the Commissioner's assertion that "[n]o abnormal mental findings were recorded at these visits" irrelevant to its consideration of the ALJ's evaluation of the evidence. (Doc. 28 at 7.)

- On September 1, 2015, a Valle Del Sol provider performed a psychiatric examination as part of a psychiatry evaluation, finding: "**Abnormal / Psychotic thoughts**: Has abnormal/psychotic thoughts. C/o of ongoing auditory hallucinations and some visual. Severity appears independent of substance use. Copes well, good reality testing." (AR 496 (emphasis in original).)

- On July 13, 2016, Dr. Monzones recorded behavioral observations during a neurobehavioral status examination, finding: "Affect was restricted, and consistent with anxious mood, although this seemed to improve as the exam progressed. He was highly ruminative about a reported childhood incident . . . Frustration tolerance was somewhat poor for challenging tasks, as he appeared notably anxious and frustrated when challenged." (AR 547.)

- On May 24, 2018, a Valle Del Sol provider performed a mental status exam as part of a clinical assessment, finding: "**Speech**: rambling and loud…. **Mood** Objective: changeable. **Affect:** blunted. **Thought Processes**: rambling and distractible…. **Impulse Control**: poor." (AR 965 (emphases in original).)

Despite these significant abnormal findings, the ALJ concluded that Mr. Bullington's mental status exams were "generally normal." (AR 596.) An ALJ "is entitled to resolve conflicts in the record," but he may not "'pick and choose among medical reports, using portions of evidence favorable to [his] position while ignoring other evidence,' or mischaracterize or downplay evidence to support [his] findings." *Bryant v. Comm'r, SSA*, 753 F. App'x 637, 641 (10th Cir. 2018) (quoting *Hardman v. Barnhart*, 362 F.3d 676, 681 (10th Cir. 2004)) (citations omitted). Here, the ALJ failed to discuss any of the abnormal mental status exam findings in the record and provided no explanation for his conclusion that the findings were generally normal. Without an

explanation, the Court is left to conclude that the ALJ improperly cherry-picked the evidence supporting his conclusion.

The Commissioner argues that the ALJ properly cited to the evidence on which he relied and if the Court were "to ignore the evidence cited by the ALJ and give more credence to other evidence," it would be improperly re-weighing the evidence. (Doc. 28 at 8.) However, as explained above, the ALJ did not even mention significantly probative conflicting evidence and failed to discuss whether he rejected it or why. Thus, there is no indication that the evidence was weighed in the first instance and nothing for the Court to re-weigh.

> 2. *The ALJ improperly evaluated the evidence of Mr. Bullington's hallucinations and blackouts in rejecting Dr. Nadig's opinion.*

The ALJ provided three other justifications for rejecting Dr. Nadig's finding of a severe limitation in Mr. Bullington's ability to adapt to changes in the workplace: (1) there is no "objective" evidence of "recurrent psychotic symptoms"; (2) there is no "credible" evidence of such symptoms; and, (3) there is no "objective" or "medical" evidence of "recurrent blackouts or syncope." (AR 594, 596). However, as explained below, each of these justifications is flawed.

First, the ALJ's reliance on the lack of "objective" evidence of Mr. Bullington's visual and auditory hallucinations is unsound. As the Tenth Circuit has explained, "[t]he practice of psychology is necessarily dependent, at least in part, on a patient's subjective statements." *Thomas v. Barnhart*, 147 F. App'x 755, 759 (10th Cir. 2005). This is particularly true of symptoms like hallucinations, which are inherently subjective and intermittent. Indeed, the ALJ fails to explain what "objective" evidence Mr. Bullington could have supplied to show that he experiences them.

Relatedly, the ALJ erred in his credibility analysis of Mr. Bullington's psychotic symptoms. "Credibility determinations are peculiarly the province of the finder of fact, and [the Court] will not upset such determinations when supported by substantial evidence." *Cowan v.*

*Astrue*, 552 F.3d 1182, 1190 (10th Cir. 2008) (quotations and citations omitted). Nevertheless, "findings as to credibility should be closely and affirmatively linked to substantial evidence." *Id.* (citations, quotations, and alterations omitted).

Here, the record shows that Mr. Bullington has reported auditory and visual hallucinations on many occasions, including to providers and in testimony at both of his hearings. (*See* AR 69, 466-67, 474, 483–84, 496, 497, 545, 628, 825.) The ALJ tacitly rejected this evidence as not "credible." (AR 594, 596.) However, he did not closely and affirmatively link this credibility finding to any evidence in the record. (AR 594, 596.) As such, the Court cannot meaningfully review it.

The Commissioner argues that the ALJ properly found "no credible evidence of recurrent psychotic symptoms" because Mr. Bullington's November 2018 and April 2019 Treatment Plans from Valle Del Sol state that his "[l]ast hallucination was a long time ago ... years ago. 'May have been caused by the drugs I was taken [sic].'"[13] (Doc. 28 at 9; AR 987, 1009 (ellipses in original)). But this argument is an improper post-hoc rationalization.

The Court "may not create or adopt post-hoc rationalizations to support the ALJ's decision that are not apparent from the ALJ's decision itself." *Haga v. Astrue*, 482 F.3d 1205, 1207–08 (10th Cir. 2007); *see also Robinson,* 366 F.3d at 1084 (ALJ's decision must be evaluated "on the reasons stated in the decision"); *Allen v. Barnhart*, 357 F.3d 1140, 1142 (10th Cir. 2004) ("Affirming this post hoc effort to salvage the ALJ's decision would require us to overstep our institutional role and usurp essential functions committed in the first instance to the administrative

---

[13] At his September 2020 hearing, Mr. Bullington testified that he did not have "hallucinations" but did "hear voices" the day before the hearing. (AR 628.) This suggests that when Mr. Bullington reported his "[l]ast hallucination was a long time ago," (AR 987), he may have been referring to visual hallucinations but not auditory ones.

process."). In his decision, the ALJ did not discuss or cite the treatment plans on which the Commissioner now relies. (*See generally* AR 589-600.) As discussed above, credibility findings must be "closely and affirmatively linked to substantial evidence," *Cowan,* 552 F.3d at 1190, and the ALJ did not provide the requisite link. The Commissioner's attempt to do so now is therefore unavailing.

Finally, the ALJ erred in relying on the lack of "objective," "medical" evidence of Mr. Bullington's recurrent blackouts. "The absence of evidence is not evidence," and an ALJ has a duty to develop the record "even if the claimant is represented by counsel." *Thompson v. Sullivan*, 987 F.2d 1482, 1491, 1492 (10th Cir. 1993). An ALJ cannot base a finding on a lack of medical evidence when such evidence is in his or her power to obtain. *See Baker v. Bowen,* 886 F.2d 289, 292 (10th Cir. 1989).

Here, Mr. Bullington told Dr. Nadig that he experiences "periodic 5-10 minute loss[es] of consciousness occurring sporadically." (AR 483-84.) Dr. Nadig opined that this "syncope needs to be addressed before he can work safely in any setting" and recommended a "[n]euro consult," remarking on "the possibility he is experiencing partial seizures." (AR 486.) Notably, Mr. Bullington also told Dr. Monzones that "he has occasionally burned his food due to falling asleep while cooking." (AR 545.) If the ALJ believed the record did not include sufficient medical evidence regarding Mr. Bullington's reports of blackouts, he was required to develop the record on this point so that a proper determination could be made, particularly in light of Dr. Nadig's recommendation of a consultative neurological examination.[14]

---

[14] Mr. Bullington did subsequently undergo a neuropsychological evaluation by Dr. Monzones, a *psychologist*, to assess his cognitive abilities (AR 544-52); however, there is no record of a consultative evaluation by a *neurologist* to assess his recurrent blackouts. Also, although Mr. Bullington did see Dr. AbdeleRahman, a neurologist, for carpal

In sum, the ALJ gave little weight to Dr. Nadig's opinion that Mr. Bullington has a severe limitation in adapting to changes in the workplace due to his hallucinations and blackouts. In making this determination, the ALJ failed to adequately explain whether or how he considered multiple abnormal findings on Mr. Bullington's mental status exams and failed to properly evaluate the evidence of Mr. Bullington's recurrent hallucinations and blackouts. Thus, the ALJ did not provide the Court with a sufficient basis to determine that he followed correct legal standards in evaluating Dr. Nadig's opinion, and remand is warranted.

### IV.  CONCLUSION

For the reasons stated above, the ALJ failed to properly evaluate the opinions of Drs. Aragon and Nadig. Because of these errors, the Court cannot determine whether the ALJ applied correct legal standards and whether his findings are supported by substantial evidence. Mr. Bullington's Opposed Motion to Reverse and/or Remand (Doc. 24) is therefore GRANTED, and this matter is remanded to the Commissioner for further proceedings consistent with this Memorandum Opinion and Order.

IT IS SO ORDERED.

_____
KIRTAN KHALSA
UNITED STATES MAGISTRATE JUDGE

---

tunnel syndrome and chronic post-traumatic headaches in 2016, (AR 557-59, 577), there is no evidence that this provider was ever asked to evaluate Mr. Bullington's blackouts.

23